Nov. Term,
1855.

BEEBE
v.
THE STATE.

6  501|
151  266|

·BEEBE *v.* THE STATE.

So much of the act "to prohibit the manufacture and sale of spirituous and intoxicating liquors," &c., approved *February* 16, 1855, as is prohibitory of the right to manufacture such liquors, and also so much thereof as relates to the establishment of agencies and the appointment of agents to sell such liquors, is unconstitutional and void.

APPEAL from the *Marion* Court of Common Pleas.

PERKINS, J.—*Roderick Beebe* sued out from the *Marion* Common Pleas a writ of *habeas corpus* to obtain deliverance from imprisonment in the county jail. The sheriff, being jailer, made return to the writ that he .held said *Beebe* in custody by virtue of *mittimuses* to him directed by the mayor of *Indianapolis*, reciting that said *Beebe* had been convicted and fined under the provisions of the act to prohibit the manufacture and sale, except, &c., of intoxicating liquors, passed by the legislature of 1855, approved on the 16th of *February*, and published in all the counties of the state on the 17th of *May*, and appointed to take effect on the 12th of *June* of that year, and had not paid or replevied the fines, &c.

The alleged offences were shown to have been committed after the 12th of *June.*

Upon this return, *Beebe* moved the Court to discharge him from custody, but the Court overruled the motion. The ground of the motion, as stated, was, that the liquor act of 1855 was unconstitutional and therefore void; that a conviction under it was consequently invalid; and that, . as the facts of the case appeared upon the face of the return, it showed that *Beebe* was illegally restrained of his liberty.

Counsel on both sides concede in argument that the record presents the question of the validity of, at least, what

*Note.*—The act creating the office of Reporter requires that each volume of reports shall contain not less than 600 pages. It being necessary, in order to make out the 600 pages, to include in this volume some of the opinions delivered at the *November* term, 1855, it has been thought best, on account of the interest felt in the questions involved in the case of *Beebe* v. *The State,* to include the opinions delivered in that case in this volume.

is alleged to be the prohibitory portion of said liquor act; and that question will, therefore, without inquiry upon the point, be considered. We approach it with all the caution and solicitude its nature is calculated to inspire, and that intention of careful investigation its importance demands, feeling that the consequences of the principles we are about to assert, will not be confined in their operation to this case alone.

Preliminary to the discussion of the main questions involved, however, the course of argument of counsel requires that we should say a word by way of fairly setting forth the duty this Court has to perform in the premises, viz., the simply declaring the constitutionality or unconstitutionality of the law, with an assignment of the reasons upon which the declaration is based.

It will not be for us to inquire whether it be a good or a bad law, in the abstract, unless the fact, as it might turn out to be, should become of some consequence in determining a doubtful point on the main question. It not unfrequently becomes the duty of Courts to enforce injudicious acts of the legislature because they are constitutional, and to strike down such as, at first view, appear to be judicious, because in conflict with the constitution.

With these remarks, we proceed to the examination of the feature of the liquor act of 1855 now more especially presented to the Court. We shall not spend time upon the inquiry, whether, on the day it came into force, there were existing unsold, manufactured products in the hands of the distillers and brewers upon which it operated, rendering them valueless, or whether such products had all been disposed of between the passage and taking effect of the law. We shall direct our investigation to the character of its operation upon the future manufacture, sale, and consumption of intoxicating liquors. And,

1. Is it prohibitory?

The first section enacts, "that no person shall manufacture, keep for sale, or sell," any "ale, porter, malt beer, lager beer, cider," wine, &c.

The second section permits the manufacture and sale of

cider and wine, under certain restrictions, by any and all of the citizens of the state.

Other sections permit the manufacture of whiskey, ale, &c., by persons licensed for the purpose, so far as may be necessary to supply whatever demand certain persons called county agents may make upon them. These agents are authorized to sell for medicinal, mechanical, chemical and sacramental uses, and no other, and may procure their liquors of the licensed manufacturers, but are not required to do so, and as matter of fact do not, but obtain them in most cases from abroad. They constitute no part of the people engaged in business on their own account, but are appointed, under the law, by the county commissioners; supplied with funds from the county treasury; paid a compensation for their services by the county; sell at prices fixed for them; and make the profits and losses of the business for the public treasury and not for themselves. We say they are furnished with public funds. They are so in all cases; for where they, in the first instance, invest their own, it is by way of loan to the county at a fixed rate of interest, and the amount is refunded by the county with interest. These selling agents then are, and for convenience may be denominated, government agents; for it is all one in principle whether the government creates and furnishes them with funds through the medium of the counties, or appoints them directly by statute and supplies them with funds from the state treasury. To express, then, the substance of the main provisions of the law, they may be paraphrased thus:

1. Be it enacted, that the trade and business of manufacturing whiskey, ale, porter and beer, now and heretofore carried on in this state, shall cease; except that any person specially licensed to manufacture for medicine, &c., for the government, may do so, and sell to that extent, if the government should conclude to buy of such person, but not otherwise.

2. That no person in this state shall sell any whiskey, beer, ale or porter, unless the sale be to an agent of the government, or by such agent for medicine, &c. And, as

Nov. Term,
1855.

BEEBE
v.
THE STATE.

no person is allowed to provide himself with those arti-
cles by manufacture or purchase, to use as a beverage, it
results,

3. That no person in this state shall drink any whiskey,
beer, ale or porter, as a beverage, and in no instance except
as a medicine.

It thus appears that the law absolutely forbids the peo-
ple of the state to manufacture and sell whiskey, ale, por-
ter and beer for use as a beverage, or at all, except for the
government, to be sold by it for medicine, &c.; and it pro-
hibits absolutely the use of those articles by the people as
a beverage.

The exception as to the admission of foreign liquors
under the constitution and laws of the *United States*, will
not be noticed, for the reason that they are admitted sim-
ply because it is conceded that they can not be prohibited,
and not in accordance with the spirit and policy of the
state statute; and which foreign liquors may, or may not,
be obtained here, according to the contingent action of
other powers; and for the further reason, that their admis-
sion, if claimed to be a part of the object and policy of
the state liquor law, or in order to supply the people with
liquor as a beverage, renders the law doubly objectionable,
for, while, according to such a view, the law designs to
permit the use of liquors as a beverage, it prohibits the
people from manufacturing for their own use. It is as if
the law were that the people might eat bread, but should
not raise the grain and grind it in flour wherewith to
make it. It would be an act to prohibit the people from
themselves producing, and to compel them to purchase
from abroad what they might need to eat and drink. It
would involve the principle of an act to annihilate the
state, by starving the people constituting it to death; and
such legislation would hardly comport, we think, with a
constitution established to promote the welfare and pros-
perity of the people. We assume it as established, then,
that the liquor act in question is absolutely prohibitory of
the manufacture, sale and use, as a beverage, by the peo-
ple of this state, of whiskey, ale, porter and beer.

The opinion has, indeed, been advanced, that the manufacture for sale out of the state is not prohibited, but it has not the substance of a shadow; and the morality of that law which prohibits the distribution of pauperism and crime, disease and death, at home, but permits them to be scattered amongst our neighbors, is not to be envied.

And we may as well remark here as anywhere, that if the manufacture and sale of these articles are proper to be carried on in the state for any purpose, it is not competent for the government to take the business from the people and monopolize it. The government can not turn druggist and become the sole dealer in medicines in the state; and why? Because the business was, at and before the organization of the government, and is properly at all times, a private pursuit of the people, as much so as the manufacture and sale of brooms, tobacco, clothes, and the dealing in tea, coffee and rice, and the raising of potatoes; and the government was organized to protect the people in such pursuits from the depredations of powerful and lawless individuals, the barons of the middle ages, whom they were too weak to resist, single-handed, by force; and for the government now to seize upon those pursuits is subversive of the very object for which it was created, and is inconsistent with the right of private property in, and pursuits by, the citizen. "A government is guilty of an invasion upon the faculties of industry possessed by individuals, when it appropriates to itself a particular branch of industry, the business of exchange and brokerage for example; or when it sells the exclusive privilege of conducting it." *Say's* Political Economy, note to p. 134.

There are undertakings of a public character, such as the making of public highways, providing a uniform currency, &c., that a single individual has not power to accomplish, and which government must therefore prosecute; but they are not the ordinary pursuits of the private citizen. These, certainly, as the general rule, and we are not now prepared to name an exception, the government can not engage in. This is all we shall here say upon

this point.   Time and space forbid that we should elabo-
rate all that arise in the case.

The question now presents itself,

2. Could the legislature of this state enact the prohibi-
tory liquor law under consideration?

Few, if any, judicial decisions will be found to aid us in
investigating this question, as no such law, in a country
possessed of a judiciary and a constitution limiting the
legislative power, has, till of late, been enacted.   Hence,
it has not often, if at all, as to this point, passed under
judicial consideration.

A number of *European* writers on natural, public, and
civil law, are cited by counsel on behalf of the state, to
show the extent of legislative power; but those writers,
respectable, able, and instructive upon some subjects as
they are admitted to be, are not authority here upon this
point.   They are dangerous, indeed utterly blind guides to
follow in searching for the landmarks of legislative power
in our free and limited government; for they had in view,
when writing, governments as existing when and where
they wrote, under which they lived and had been edu-
cated, and which had no written constitution limiting
their powers; governments, the theory of which was, that
they were paternal in character; that all power was in
them by divine right, and they, hence, absolute; that the
people of a country had no rights except what the govern-
ment of that country graciously saw fit to confer upon
them; and that it was its duty, like as a father towards
his children, to command whatever it deemed expedient
for the public good, without first, in any manner, consult-
ing that public, or recognizing in its members any indivi-
dual rights.

Indeed the discovery of the great doctrine of rights in
the people as against the government, had not been made,
when the writers above referred to lived.

Such governments as those described could adopt the
maxim quoted by counsel, that the safety of the people is
the supreme law, and act upon it; and being severally the

sole judges of what their safety in the countries governed respectively required, could prescribe what the people should eat and drink, what political, moral and religious creeds they should believe in, and punish heresy by burning at the stake, all for the public good. Even in *Great Britain*, esteemed to have the most liberal constitution on the *Eastern* continent, *Magna Charta* is not of sufficient potency to restrain the action of parliament, as their judiciary does not, as a settled rule, bring laws to the test of its provisions. Laws are there overthrown only occasionally by judicial construction. Such a thing, indeed, as deciding a law or royal decree unconstitutional, in an absolute government is unknown. Hence the oppression of the people.

And it must be admitted that efforts have not been wanting to engraft upon the governments of this country something of the same principle. It is, in fact, the "general welfare" doctrine, under which it was claimed by latitudinarians that the congress of the *United States* could enact alien and sedition laws, national banks, &c., for the public good. It is the same principle upon which some of the states enacted laws compelling men to attend, on *Sunday*, a *Protestant* church, and pay to support it. The proposition was laid down in them in regard to religion, as by counsel for the state here in regard to prohibition, that it was for the public morals, and good of families, and prevention of crime, that men should observe the ordinances of the gospel, and occupy seats in *Protestant* churches, instead of other places, on the sabbath; and, hence, the state compelled them by law to do so. But the doctrine has been fraught with oppression, and has not produced, permanently, promised results. Limitations have been inserted in constitutions upon the legislative power to prevent this oppression. And over the people of this state hangs the shield of written constitutions, which are the supreme law, which our legislators are sworn to support, which grant a restricted legislative power, within which the legislators must limit their action for the public welfare, and whose barriers they can not overleap under

any pretext of supposed safety of the people; for along with our written constitutions we have a judiciary, created by them a co-ordinate department of the government, whose duty it is, as the appropriate means of securing to the people safety from legislative aggression, to annul all legislative action without the pale of those instruments. This duty of the judicial department, in this country, was demonstrated by chief justice *Marshall*, in *Marbury* v. *Madison*, 1 Cranch 137, and has since been recognized as settled *American* law. Indeed it is a great distinguishing feature of a limited government.

The maxim above quoted, therefore, as applied to legislative power, is here without meaning.

Nor does it prove the power of the state legislature to enact the law in question, to show that the Supreme Court of the *United States* has decided that it can not declare such a state law inoperative, for that Court can only declare void such state laws as conflict with the restrictions imposed upon state power by the constitution of the *United States;* and if, in that constitution, the states are not restrained from passing laws in violation of the natural rights of the citizen, the Supreme Court of the *United States* can not act upon such laws when passed, because they do not fall within its jurisdiction. But it does not follow that because the constitution of the *United States* does not prohibit state legislation infringing the natural rights of the citizen, such legislation is valid. The constitution of the *United States* may not, but that of the state may inhibit it.

And so, indeed, according to many eminent judges, may principles of natural justice, independently of all constitutional restraint. This doctrine has been asserted here. In *Andrews* v. *Russell*, 7 Blackf. 474, judge *Dewey* says: "We have said that the only provisions in the federal or state constitution, restrictive of the power of the legislature," &c., "are," &c. "There are certain absolute rights, and the right of property is among them, which, in all free governments, must of necessity be protected from legislative interference, irrespective of constitutional checks and

guards." Should we find, however, in the course of this investigation, that the constitution of our free states does in fact sufficiently protect natural rights from legislative interference, as it surely does, or it is grievously defective, it will not become necessary for us to inquire whether, in any event, it might be proper to fall back upon the doctrine above so unhesitatingly asserted.

But before proceeding further, it is proper we should say, that eminent judges of the Supreme Court of the *United States* have asserted that a state, so far as not restrained by the constitution of the *United States*, has the same "unlimited jurisdiction over all persons and things within its territorial limits as any foreign nation;" *New-York* v. *Miln*, 11 Peters 102; License Cases, 5 How. 504; and that we admit the doctrine for the purposes of this case, in the application which they gave it, viz., that the state, in its sovereign capacity, possesses this power; not that the legislature, under our state constitution, possesses it. The doctrine asserted is, that the state, in its sovereign capacity, possesses such power, which, by a constitution, she is capable of conferring, if she pleases, upon her legislature; not that she has conferred it. No judge of the Supreme Court of the *United States*, in the cases cited, assumed to analyze the constitution of this state, and say that it conferred upon, or left with, the legislature, the unlimited powers of a despotism, or what power it did grant or withhold.

We admit further, at this point, that it has also been declared, that the taxing power of a state is unlimited, and, hence, may be exercised in such a manner as practically to prohibit particular pursuits upon which it may be made too heavily to fall; for example, the selling of dry goods or liquors. But an enactment of such description has none of the features of a formal prohibitory law, for it is based upon the assumption that the taxed pursuit is to exist and not cease; its continuance is, indeed, invited by the act, as its cessation would defeat the very object of the enactment, being revenue; and prohibition, if it resulted, would not be found in the law, but in the accident

that nobody happened to be able, or to feel disposed at the time, to pay the tax for the sake of the business. This would be accidental, and might be temporary.

The question then recurs, the one now to be decided— Does our constitution prohibit the passage of such an act as that involved in the present suit?

That instrument contains a grant of legislative power, and it contains express limitations upon that grant. There are also, probably, implied limitations. But if the present case can be decided upon the express limitations, it will not be necessary for us to discuss the questions of the extent of power conferred upon the legislature by the general grant, and of implied limitations.

We proceed to examine the express limitations. The first section of the first article declares, that "all men are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness." Under our constitution, then, we all have some rights that have not been surrendered, which are consequently reserved, and which government can not deprive us of unless we shall first forfeit them by our crimes; and to secure to us the enjoyment of those rights is the great aim and end of the constitution itself.

It thus appears conceded that rights existed anterior to the constitution; that we did not derive them from it, but established it to secure to us the enjoyment of them. And it here becomes important to ascertain with some degree of precision what these reserved natural rights are. To do this we must have recourse to the common law, as the section was undoubtedly inserted in the constitution with reference to it. Counsel, in the argument of this cause, on the part of the state, it is true, deny the existence of any such rights in *Indiana*. Our answer is, the constitution above quoted has settled the point here; and a legislature, acting under that instrument, is estopped by its solemn declaration to deny the existence of the natural rights there asserted. That assertion, while it remains, is binding within the territory of *Indiana*. When the people of the state shall become satisfied that it is founded in

mistake, they can meet in their sovereign capacity, strike it from their organic law, and insert the contrary, that they are without natural rights, and at the mercy of the legislature. We may properly here observe, that added to these restrictive provisions of the bill of rights, in the old constitution, was the following:

"Sec. 24. To guard against any encroachment on the rights herein retained, we declare that everything in this article is excepted out of the general powers of government, and shall forever remain inviolate."

The new constitution does not contain this section; but that constitution did not intend to weaken the restraints designed for the protection of the people, and the section quoted was omitted because the expressly declared reservations in the bill of rights were necessarily taken from the absolute power of the legislature without such declaratory section. And it should be here remarked, that it is not said these rights are reserved to be used without restraint. Each individual being equally entitled to their exercise, the right of each operates as a check upon the right of every other, compelling mutual regard for those of each, and subjecting each to punishment by the judiciary, under legislative regulations, for violating the equal right of every other, and giving the injured in all cases redress by law. And further provisions of the constitution, which must be construed together with that quoted, confer powers, such as taxation, &c., on the legislature relative to these rights. Such powers may be exercised.

We proceed, then, to inquire what these reserved rights are; and to ascertain, we go, as we have said, to the common law. Chancellor *Kent*, following *Blackstone*, says, vol. 2, p. 1, "The absolute [or natural] rights of individuals may be resolved into the right of personal security, the right of personal liberty, and the right to acquire and enjoy property;" not some property, or one kind of property, but, at least, what the society organizing government recognizes as property. How much does this right embrace? How far does it extend? It undoubtedly extends to the right of pursuing the trades of manufacturing,

buying and selling, and to the practice of using. These acts are but means of acquiring and enjoying, and are absolutely necessary and incidental to them. What, we may ask, is the right of property worth, stripped of the right of producing and using?

The right of property is equally invaded by obstructing the free employment of the means of production as by violently depriving the proprietor of the product of his land. *Say's* Political Economy, 133.

In *Arrowsmith* v. *Burlingim*, 4 McLean 497, it is said: " A freeman may buy and sell at his pleasure. This right is not of society, but from *nature*. He never gave it up. It would be amusing to see a man hunting through our law books for authority to buy or sell or make a bargain." To the same effect, Lord *Coke*, in 2 Inst., c. 29, p. 47.— *Rutherforth's* Institutes, p. 20.

So far, then, we find that the people have expressly reserved the right of property, and its enjoyment, in forming their constitution, from the unlimited power of the legislature; and further to guard the right, have ordained that it shall not be taken from them without just compensation, nor be injured without a remedy therefor by due course of law, that is, a legal trial in Court, nor be subject to unreasonable seizure, &c. Sec. 11, art. 1, and ss. 12 and 21 of the same article. They have, however, as we have said, authorized the legislature, by art. 10, sec. 1, to tax, by a "uniform and equal rate," the property of the people of the state, and impliedly, as we have seen, to take it, by paying for it, for the public use. Now these restraints upon the legislative power were inserted in the constitution for some purpose; what was it? And they have some meaning; what is it? Wherein do they furnish security to the citizen? This Court must determine. Their object was, beyond all question, to protect the people from aggression on the part of the government; and under them the legislature can not take the property, the liquors of a single individual, if they are property, when not needed for public purposes, and then only upon compensation. But if the legislature can not deprive a single citizen of

his property, can it, by a general law, deprive all the citizens of theirs? If that body could not enact that *A. B.* should no longer cultivate his farm, could it by a general law enact that all the farmers of the state should cease to cultivate theirs? Further, these restrictions in the constitution apply alike to all property; they make no distinction. Is liquor, then, property? Is a distillery property? They are so, unquestionably, in *Indiana*. At the time of the adoption of our present constitution, there were fifty distilleries and breweries in the state, which turned out annually manufactured products to the value of half a million of dollars, used mostly by our people as a beverage. Liquor had always been an article of use and traffic in the state, and always been taxed as property. With these facts existing, the subject was repeatedly brought before the constitutional convention, and that body refused to make any change in the relation of the government towards this species of articles. We are safe in saying, then, that under this constitution, the government could not take, for public use, from a single individual, a single barrel of liquor without paying for it. Can it, then, by a general law, annihilate the entire property in liquors in the state?

There are other provisions of the constitution that have some bearing upon this point, as evincing regard by that instrument for individual property and the right of traffic. Sec. 22, of art. 1, declares that—

"The privilege of the debtor to enjoy the necessary comforts of life, shall be recognized by wholesome laws, exempting a reasonable amount of property from seizure or sale for the payment of any debt or liability hereafter contracted."

Now suppose the property of a debtor to consist, as the fact might be, entirely of liquor. Of what avail is this constitutional provision, if the government can step in at will and confiscate that property?

Again, section 24, of the same article, provides that no law shall ever be passed impairing the obligation of a contract. Yet here is a law, which, by prohibiting an entire

pursuit and rendering valueless all the property involved in it, must, of necessity almost, impair all executory contracts that have grown out of that pursuit, and render them utterly incapable of fulfilment.

The position, however, is taken, on the part of the state, that it is competent for the legislature, whenever it shall deem proper, to declare the existence of any property and pursuit deemed injurious to the public, *nuisances*, and to destroy and prohibit them as such; and that such action of the legislature is not subject to be reviewed by the Courts. We deny this position. We deny that the legislature can enlarge its power over property or pursuits by declaring them nuisances, or by enacting a definition of a nuisance that will cover them. Whatever it has a right by the constitution to prohibit or confiscate, it may thus deal with, without first declaring the matter a nuisance; and whatever it has not a right by the constitution to prohibit and confiscate, it can not thus deal with, even though it first declare it a nuisance. It can not do by indirection what it can not do directly. For example, the constitution of the *United States* prohibited the abolition by congress of the foreign slave trade till 1808. Const. *U. S.*, art. 1, s. 9. Now, prior to that date, congress could not have, by direct enactment, prohibited the slave trade, for want of power. Could she, then, have declared the trade a nuisance, and then abolished the nuisance? Had she the power to do that?

Again, art. 1, sec. 9, of the constitution of *Indiana*, declares that—

"No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever; but for the abuse of that right, every person shall be responsible."

Under this provision, all will admit that if the legislature of this state should assume that the press had become so licentious as to require its suppression, and should enact a law accordingly, that law would be void, and this Court bound to pronounce it so. But could the legislature evade the constitutional provision, by first declaring

the press throughout the state a nuisance, and then enact-
ing that it should cease to exist? It surely could not, or
the constitutional provision is worthless.

Now, as the legislature can not declare the press and
printing business nuisances, because protected by the con-
stitution, so it can not declare property and the acquisition
and use of it, nuisances, for precisely the same reason.

But the section above quoted of the constitution itself,
points out the remedy for the evil of abuse. And it in-
dicates the general remedy in all these cases. It is the
responsibility, that is, the liability to suit and punishment,
and loss, by forfeiture, of the particular press made the in-
strument of abuse, of "every person" who shall be guilty
of committing such evil. And the questions of the guilt
of the individual and abuse of the property, in every case,
are to be decided by the judiciary, and the punishment
inflicted by that department. Any other mode of adjudg-
ing guilt and inflicting punishment, is but mob or lynch
law.

But to return. The questions whether a law is in con-
flict with the constitution or not, and whether a thing is a
nuisance or not, and, hence, liable to forfeiture, are judi-
cial, and to be finally determined by the Courts alone.
Such is the organic law of the state, and it is, hence, need-
less to discuss its propriety here. See *Doe* v. *Douglass*, 8
Blackf. 10. Why it has been so ordained in the constitu-
tion, whether because of the supposed superior capacity of
the judicial department to judge of such questions, or for
other reasons, it is not particularly important to inquire.
We may, in this connection, however, quote with propriety
from *Young* v. *The State Bank*, 4 Ind. R. 301, as follows:
"Now, the constitution [article 3 of that of 1851] above
quoted, says, the legislature shall not perform a judicial
act. The granting of a new trial [in a suit in Court] we
have seen, is a judicial act. Therefore, the legislature can
not grant a new trial. And it is a power that should not
be possessed by the legislature in its legislative capacity;
because, in that capacity, it would not be governed in its
action by legal rules. And to permit it to dispose of judi-

cial questions in that capacity, would be in the highest degree dangerous to the rights of the individual members of the community."

It is, indeed, most strenuously contended, in this case, by counsel, that the propriety and validity of the liquor act under consideration, were questions to be determined by the discretion of the legislature, and that the determination of that body is not subject to review in this tribunal; and some early cases in the Supreme Court of the *United States*, particularly *Mc Cullough* v. *The State of Maryland*, 4 Wheaton R. 316, are cited as sustaining the doctrine. We shall enter into no argument upon the theory or first principles of the question. We shall treat it as one of authority. Indeed, in the case in *Wheaton*, *supra*, the distinguished chief justice, in the opening of his opinion, uses language that might justify a review of the law before us by this Court. He says that "a doubtful question, in which the great principles of liberty are not concerned," might perhaps be put to rest by the repeated action of the legislature; implying, certainly, that had the question in that case been one that was conceived to concern those great principles, it might have been decided by a different rule. Such is the question now before this Court for decision. It does concern the great principles of liberty. It is to determine whether one single dollar's worth of property in •this state, and the right to pursue a single employment; whether, indeed, a single *iota* of personal liberty remains to the people, secure from the invasion of a despotic legislature—for if it can strike down one of the recognized pursuits of the citizens, it can all. But whatever may be the rule asserted in the early cases, that of *Bronson* v. *Kinzie*, 1 Howard (U. S.) R. 311, so late as 1843, determines, beyond all doubt, that the Courts will review and decide upon the exercise of legislative discretion, so far as to determine whether, in the given case, the constitution has been violated. It involved and decided precisely the question so earnestly argued in this case, and which we are now considering. In that case, the legislature of *Illinois* enacted a law regulating the replevy of

judgments and the sale of property on execution. There
was no provision in the constitution expressly prohibiting
legislation upon legal remedies, and hence it was claimed
that, under the general grant of legislative power, the right
to so legislate passed to the legislature in its discretion.
But the constitution of the *United States* did forbid the
passage of a law impairing the obligation of a contract;
and the Supreme Court decided that they would look into
the manner in which the legislature had exercised its dis-
cretion in a matter where there was no express restriction,
to see that it had not, in that exercise, violated some ex-
press constitutional provision. Judge *McLean* dissented,
contending for the right of legislative discretion; but the
same Court, in subsequent cases, reaffirmed the doctrine
of *Bronson* v. *Kinzie*, and it is now the settled law.
*Mc Cracken* v. *Hayward*, 2 How. (U. S.) R. 608.— *Gantly's
Lessee* v. *Ewing*, 3 *id*. 707.— *Curran* v. *Arkansas*, 15 *id*.
304. This Court unanimously adopted the same rule in
*Thomas* v. *The Board of Commissioners of Clay County*,
5 Ind. R. 4, and in *Maize* v. *The State*, 4 *id*. 342. And
can it be that legislative discretion shall be controlled in
the matter of violating a contract, and not where it anni-
hilates a great pursuit involving millions of dollars and
innumerable contracts?

Another position is taken by counsel who last argued
this cause for the state, and insisted upon with great
confidence. It is this: that the legislature has unlimited
power over the commerce of the state, and can, hence,
prohibit altogether the sale of liquors, or direct the sole
purposes for which they may be sold. It is argued in this
way. Congress has power to regulate foreign commerce,
commerce between the states and with the *Indian* tribes;
and under this power she may prohibit all commerce, in
the named cases, confiscate property, &c. The legislature
of the state has power, under the general grant, to regu-
late domestic commerce; hence, like congress, it may pro-
hibit, confiscate, &c.

The cases are not parallel and the reasoning is unsound.
The grant to congress of power to regulate commerce, is,

since 1808, unlimited. There is no bill of rights in the constitution of the *United States;* in short, no restriction, unless by implication, upon the power of congress to regulate trade, in the specified instances. Hence, congress, do what she may, can not be shown, on this subject, to have violated any restriction in the federal constitution under which that body acts, because it contains none.

Now how is it with the legislature and constitution of this state? Our state constitution contains, as we have seen, certain restrictions upon the legislative power, certain sections declaring rights in the citizen as against the government, and these restrictions operate just as potently upon the power of the legislature to regulate commerce as to do anything else—prevent that body just as effectually from infringing the reserved rights by assumed regulations of commerce as by any direct enactment. To illustrate. The constitution declares that every citizen shall be secure in the right to worship *God* according to the dictates of his own conscience. Now the great body of religious denominations in this state, conscientiously believe they are bound to celebrate one of the ordinances of the gospel by the use of bread and wine. But wine is an article of commerce, and its purchase is a commercial transaction. Therefore, upon the argument, the legislature has power to prohibit its use, or declare the purposes for which it may be sold and purchased. It may, therefore, declare that it shall not be sold or purchased for sacramental use, thus, in effect, overthrowing the constitutional provision, that the citizen shall have the right to worship according to his conscience, and abolishing the general practice of the christian ordinances in the state. This the legislature can not do. It must regulate within the restrictions of the constitution. So the purchase of nails and lumber is commerce. Can the legislature say, they may be purchased to build barns with, but not churches or dwellings?

Again, the constitution says, as we have quoted above, that the right of printing—the freedom of the press—shall remain inviolate in this state. But the purchase of paper to print on, ink to print with, and type, is commerce.

And can the legislature prohibit, or declare the uses for which such articles may be purchased, saying, they may be purchased for the purpose of printing advertising hand-bills, but not to print books or newspapers? Surely such a law would as effectually violate the constitution, as a direct enactment that no books or newspapers should be printed in the state.

We might continue these illustrations, but it can not be necessary.

The legislature has no more right to violate the constitution, under the guise of a regulation of commerce, than by a statute literally in conflict with it. And if, as in the above-instanced cases, the express provisions of the constitution secure to the citizen his property and its reasonable use, the legislature can not take away the right by any legerdemain of legislation. And whenever the legislature does so invade the constitutional right of the citizens, they are not bound to submit to the outrage for two years, till the assembling of another legislature, nor to resort to the terrible remedy of revolution, but may quietly and peacefully invoke the action of the judiciary to annul the act of legislative usurpation.

And here we are called upon to mark the line which bounds the power of the legislature on the one hand and the right of the citizen on the other; to say what the legislature may and may not do in all cases. We answer that we have already pointed out the line, so far as to show that in this case the legislature has overstepped it and invaded the constitutional right of the citizen. This is all we can now be required to do. The judicial mind must place each case, as it arises, upon the proper side of the boundary admitted to exist. This will be its duty and no more. Such has been the practice.

We have said that we should treat the question of the right of the Court to judge of the grounds of a law alleged to infringe constitutional restrictions, as one of authority. We will however add the remark, that the Court knows, as matter of general knowledge, and is capable of judicially asserting the fact, that the use of beer, &c.,

as a beverage, is not necessarily hurtful, any more than the use of lemonade or ice-cream. See *Burke's* Works, vol. 2, Dearb. Lib. Ed., p. 190, in "Thoughts on Scarcity." It is the abuse, and not the use, of all these beverages that is hurtful. But the legislature enacted the law in question upon the assumption that the manufacture and sale of beer, &c., were necessarily destructive to community; and in acting upon that assumption, in our own judgment, has unwarrantably invaded the right to private property, and its use as a beverage and article of traffic.

What harm, we ask, does the mere manufacture or sale or temperate use of beer do to any one? and the manufacturer or seller does not necessarily know what use is to be made by the purchaser of the article. It may be a proper one. And if an improper one, it is not the fault of the manufacturer or seller, but it is thus appropriated by the voluntary act of another person, and by his own wrong. And will the general principle be asserted, that to prevent the abuse of useful things, government shall assume the dispensation of them to all the citizens—put all under guardianship? Fire-arms and gunpowder are not manufactured and sold to shoot innocent persons with, but are often so misapplied. Axes are not made and sold to break heads with, but are often used for that purpose in the hands of murderers. Bread is not made to make gluttons with, but is perverted to that use. Razors are not made to cut throats with, but are applied in that way by the suicide. The *Almighty* did not create fists to knock people down with, but they are often put to that use, and still he permits men to be born with fists. Yet who, for all this, has ever contended that the manufacture and sale of these articles should be prohibited as being nuisances, or be monopolized by the government? We repeat, the manufacture and sale and use of liquors are not necessarily hurtful, and this the Court has a right to judicially inquire into and act upon in deciding upon the validity of the law in question—in deciding, as was done in *Bronson* v. *Kinzie, supra,* whether it is an indirect invasion of

a right secured to the citizen by the constitution. This question the Court must decide; and it must, therefore, in some manner, satisfy its judgment and conscience upon it. 5 Hill (N. Y.) R. 121, and cases cited.

The act is not one to prohibit or punish drunkenness, or any abuse of the use of liquors. Were it, a different question might be presented — one, however, on which we here intimate no opinion, as it is not before us. When a case shall arise calling for a decision as to the extent of the power of the legislature to regulate, without prohibiting, we shall be prepared to make that decision according to the best of our judgment.

The restrictions which we have examined upon the legislative power of the state, were inserted in the constitution to protect the minority from the oppression of the majority, and all from the usurpation of the legislature, the members of which, under our plurality system of elections, may be returned by a minority of the people. They should, therefore, be faithfully maintained. They are the main safeguards to the persons and property of the state. They will be maintained, in so far as depends upon us, notwithstanding the intimation at the argument, that whoever interposed an obstruction to the free course of this law, was to be swept away by an overwhelming torrent. We shall be deterred by no such ill-timed threat from what we believe to be the discharge of a solemn duty.

It is easy to see that when the people are smarting under losses from depreciated bank paper, a feeling might be aroused, that would, under our plurality system, return a majority to the legislature which would declare all banks a nuisance, confiscate their paper and the buildings from which it issued. So with railroads, when repeated wholesale murders are perpetrated by some of them. And in *Great Britain* and *France*, we have examples of the confiscation of the property of the churches even, which here the same constitution that protects the dealer in beer, would render safe from invasion by the legislative power.

In our opinion, for the reasons above given, the liquor act of 1855 is void. We express no opinion upon any single provision of the act, as in the view we have taken of its general scope, it is unnecessary.

DAVISON, J.—I concur in the foregoing opinion of Judge PERKINS.

STUART, J.—*Beebe* was prosecuted before the mayor of *Indianapolis*, for two distinct violations of the liquor law of 1855. The one was a charge for manufacturing beer, the other for selling it contrary to the provisions of that act. He was tried, convicted in both cases, and fined 50 dollars in each. Failing to pay or replevy the fines, *Beebe* was committed to prison. On his application to the judge of Common Pleas, a writ of *habeas corpus* was issued. The officer having him in charge returned, as the cause of detention, the proceedings, judgment and order of the mayor in the cases referred to. After hearing he was remanded to prison. From that order he appeals.

These cases have been twice argued orally, with distinguished ability on both sides. And what is still more commendable, the argument was conducted with that moderation and forbearance so becoming in forensic discussion.

The first inquiry is, what does the record present? Simply a question of legislative power. The details of the law are not before us, and are not, of course, considered.

The inquiry here is confined to the *sale;* for the question arising on the other case for manufacture, admits of a very different solution. Having for reasons given in that case, come to the conclusion that the agency feature, and the several parts of the law relating to manufacture, were unconstitutional, the question on the sale arising on the other *Beebe* record alone remains.

The act assumes to confine the use of liquor to the departments of science and the ordinances of christianity.

And the question is, was it competent for the legislature thus to restrain the sale and use of intoxicating liquor?

It is admitted in argument that there is no express provision of the constitution restricting the general assembly on that subject.

But it is insisted that such restriction is implied in the first section of the bill of rights. Let us place the statute and that section of the constitution together.

Stripped of all that relates to the agency and the manufacture, the first and fifth sections, as to sale, are, in substance, that no person shall keep for sale or sell, by himself or agent, directly or indirectly, any spirituous or intoxicating liquor, except for medicinal, chemical or mechanical uses only, and pure wine for sacramental use. Laws of 1855, pp. 209, 211.

To prevent misconception, the first section of the bill of rights is quoted entire:

"Sec. 1. We declare, that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety and well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government."

According to all publicists, the right to hold and enjoy private property is among the unalienable rights. In the constitution of 1816, the right "of acquiring, possessing and protecting property," was expressly enumerated.

It becomes important, therefore, to inquire, in what sense are the rights of life, liberty and property said to be unalienable? It does not mean that the legislature shall not pass any law in relation to them. For the whole statute book is, in some measure, a standing interference with, and regulation of, these very things. The executive, the warden of the prison, the sheriff, the whole corps of executive and administrative officers, are continually taking away those rights from some citizen.

It does not mean, therefore, that those rights are to be held superior to and above the laws. They are held subordinate to such municipal laws and police regulations as the political organization in which those rights are enjoyed may rightfully enact under the constitution. They are held subject to such restraints as "the peace, safety and well-being" of the body politic may require. Thus in *Calder* v. *Bull*, 3 Dallas 386, the Supreme Court of the *United States* say, "The right of property is always subject to the rules prescribed by positive law. The right vested in the citizen is, to do certain acts, or possess certain things, according to the law of the land."

These rights, therefore, may be taken away in "due course of law," as the forfeit of violating municipal enactments.

What, then, does the unalienable right of property mean? It might be comprehensively answered, that the whole constitution is a comment on that text. It means that the citizen shall be secure in his effects from unreasonable search and seizure; s. 11, art. 1; that he shall have a right to a public trial by jury; ss. 13 and 20, *id.;* that his services or property shall not be taken without just compensation; s. 21, *id.;* and so of all the other restrictions of the constitution. "They are the barriers erected by the people" against the encroachments of the powers they have delegated to their public servants.

*Locke* says, it is against natural right for the government to "dispose of the estates of subjects arbitrarily, or divest vested rights at pleasure." The legislature can not take the property of *A.* and give it to *B.* So, in the school cases, it was said by this Court, that the legislature could not take the property of *A.* and *B.*, divert it from their use, and distribute it ratably to third persons. The unsoundness of such legislation, as violating fundamental principles, could not be doubted. 6 Ind. 83.

So also in *Wilkinson* v. *Leland,* 2 Peters 627. The property of heirs had been illegally sold, and the legislature of *Rhode Island* passed an act confirming the sale. It was in reference to this invasion of private property, that

# OF THE STATE OF INDIANA. 525

judge *Story* delivered the eloquent passage to be found in 2 Peters 657. He justly declares, "that government can scarcely be free where the estate of the citizen can be transferred without trial, without notice, and without offence."

So in *Doe* v. *Douglass*, 8 Blackf. 10, judge *Perkins*, speaking of a similar state of facts, says, "The legislature is supreme, except wherein restrictions have been imposed." He adds, "the restrictions of the constitution restrain the legislature from passing a law impairing the obligation of contracts, from the performance of a judicial act, and from any flagrant violation of the right of private property." Here the remarks must be taken with reference to the facts of the case. Judge *Perkins* was not speaking of a municipal law made to protect all. He had reference to an act of the assembly confirming the illegal sale of three lots in *Evansville*.

So in the celebrated case of *Fletcher* v. *Peck*, 6 Cranch 87. The question arose on an act of the legislature of *Georgia*, alleged to have been passed corruptly, authorizing the issue of a patent. *Marshall*, C. J., guardedly says: "To the legislature all legislative power is granted. But whether the act of transferring the property of an individual to the public, be in the nature of the legislative power, is well worthy of serious reflection." Here, also, the venerable judge was speaking, not of a municipal law or police regulation to promote the peace, safety and well-being of the people of *Georgia*. He had reference to a law operating directly on specified property of a citizen of that state.

It is in these cases, and in such a state of facts, that the *dicta* about unalienable rights, so often quoted by elementary writers, occur. These cases sufficiently indicate the meaning of "unalienable rights," as used in the first section of the constitution. They sufficiently distinguish between an act which assumes to transfer private property without trial, without notice, and without offence, from an act of municipal regulation having for its object the peace, safety and well-being of society. The application of this

distinction is obvious. Suppose the legislature of *Indiana* had passed an act appropriating fifty barrels of the appellant's beer to the use of the mayor of *Indianapolis*. This would have been an infringement of *Beebe's* "unalienable rights." Against such spoliation of his property, without offence, trial, or notice, the Courts would be bound to afford him prompt protection. But not against the operation of a municipal law enacted in conformity to the constitution.

Closely connected in the argument with unalienable rights, are the limitations of legislative power outside of the constitution. The relevancy of the inquiry is not readily appreciated. It involves many curious questions lying all along the exterior boundary of the rights and duties of rulers and people in extreme cases. It will be pardonable to decline speculation. Extreme cases seldom prove anything satisfactorily. We will therefore confine ourselves to the facts as we find them in the constitution and law, and our judicial duty in the premises.

The tendency of Courts is, or at least should be, anything but revolutionary. What rights and what legislative checks outside of the constitution, and not delegated by the people to their public servants, may exist, we are not careful to inquire. They can seldom, if ever, become a basis or rule of decision. Perhaps these inquiries might not be out of place in a popular assembly. But at this late day, in a government like ours, with distributive and well-defined powers and duties, the settlement of those abstruse questions does not seem to be the chief debt we owe the public.

It is enough for us to know, that whatever these extreme rights are, their protection does not fall exclusively within our jurisdiction. With the rights themselves the people have also prudently retained in their own hands the means of redress. They are ever ready to vindicate them at the ballot-box or by revolution, as the case may require. Among our people revolution has attained perfection. The evils or errors which afflict the body politic are intelligently investigated and traced to their source.

The remedy is simple and effectual. A constitutional convention of eminent citizens is the substitute for the armed mob of other countries. If the powers hitherto delegated are too great consistently with the private rights of the citizen, they are quietly abridged. If insufficient to afford protection, they are enlarged and moulded to meet the circumstances. So that revolution should begin with the people, and not with the Courts. Any other revolution can not readily be distinguished from subversion.

The system we have adopted is marked for simplicity. The judiciary, and all the other departments, live and move and have their official being and sphere of action in the constitution. Art. 3, s. 1. The duty of the Courts is chiefly expository. When the constitution and laws come up for adjudication, both must be regarded as the work of the same hands. Both are of the people. Both must be respected unless they conflict. 4 Ind. 342, and the authorities there cited. In case of conflict, the temporary will contained in the law, must yield to the paramount will contained in the constitution.

For the Courts to declare a law void on any other ground—to set it aside because it is impolitic or inexpedient, or even, like the liquor law, odious and oppressive in some of its features, looks like assuming to protect the people against themselves.

It is easy to imagine that the legislature may pass a very odious enactment. Our statute books abound with them. Such were both the bankrupt laws passed by congress. Interest or passion, or perhaps other dubious influences, often mould legislation. The advocates of ultra measures have the popular ear one year. A law is passed in accordance with their views. Next year those who suffer from the new policy appeal successfully to the same public. The reason is on the surface. Any enactment in advance of a sound and matured public opinion, or based upon the fluctuating fever of the hour, or odious in itself under any healthy state of the public mind, is sure to be swept from the statute book before it is dry.

But it does not thence follow that the *Courts* must

hasten to declare it unconstitutional. Much is said in the reports about a law being against "common right." Under the old constitution, a revenue law might have exempted half the property in the state from taxation. The whole burden would thus have been thrown upon the other half. This would have been against common right. 4 Ind. R. 87. Yet the Courts, acting within the sphere which our polity had assigned them, could not declare the act unconstitutional. They could not inquire into the expediency or policy of the measure. *Bepley* v. *The State*, 4 Ind. R. 264. *That* belonged to legislation—*that* the people had committed to the general assembly. The Courts could apply the rules of strict construction, and they did so. *Baker* v. *Orr*, 4 Ind. R. 86.—1 Kent, Lecture 20.—19 Ohio R. 110.—4 Peters R. 514.—*Blackwell* on Tax Titles, 481–2.

The people remedied this evil by amending the constitution. Sec. 1, art. 10.

All the Courts can do with odious statutes which are constitutional, is, to chasten their harshness by construction. Such is the imperfection of the best human institutions, that mould them as we may, a large discretion must at last be reposed somewhere. The best, and in many cases the only security, is in the wisdom and integrity of public servants, and their identity with the people. Government can not be administered without committing powers in trust and confidence. 1 Bibb 602.—*Gibbons* v. *Ogden*, 9 Wheat. R. 1.—*The Providence Bank* v. *Billings*, 4 Pet. R. 514.—*Ex Parte Alexander*, L. J. 44.

The settled rule of this Court is a strict construction of delegated powers. 5 Ind. R. 1.—4 *id.* 301.—*Id.* 342.— 5 *id.* 557.—6 *id.* 83. These decisions defined the powers of the legislature under various provisions of the new constitution. If they have led to the supposition that we could declare any statute void at pleasure, they have indeed had an evil influence. For our judicial powers are also delegated. They must receive the same strict construction which we have so often applied to those of the other departments. We hold them by the same tenure

and are bound by the same rules. We have no power over the legislature but what is given us by the constitution. In the polity of all these states, our own among the rest, judicial and legislative duties are distinguished from each other. The assembly can not grant a new trial; nor can we inquire into the necessity, policy or expediency of the laws. 4 Ind. R. 301. The third article of the constitution defines the limits of each department thus:

" The powers of the government are divided into three separate departments; the legislative, the executive, including the administrative, and the judicial; and no person, charged with official duties under one of these departments, shall exercise any functions of another," &c. 1 R. S., 48.

*Young* v. *The State Bank*, 4 Ind. R. 301, was a direct decision on a corresponding provision in the old constitution. In that case the legislature had granted a new trial. The Court, by judge *Perkins*, pithily puts the case thus: " The constitution says the legislature shall not perform a judicial act. The granting of a new trial is a judicial act. Therefore the legislature can not grant a new trial."

Apply this reasoning to our judicial powers. The constitution says the judiciary shall not perform a legislative act. The subject, necessity, policy and expediency of a law are matters of legislation. Therefore they do not belong to the judiciary. The argument is complete; the authority pertinent and conclusive as an exposition of the third article of the constitution.

Against this position there is not a single case in our own reports, but many in coincidence with it. Thus, what a law should embrace involves questions of policy more properly legislative than judicial. 5 Ind. R. 380. "Judge-made law has overrode the legislative department." *Perkins*, J., in *Spencer* v. *The State*, 5 Ind. R. 46. " Whether an act is politic, or expedient, or necessary, is not a question with which the Courts have anything to do." *Bepley* v. *The State*, 4 Ind. R. 264. And it is the principle running through all our reports. If there be no constitutional objection to a statute, it is as absolute under our system of government as in any system. 1 Kent, Lecture 20.

Nov. Term,
1855.

Beebe
v.
The State.

On the other side, the learning and diligence of counsel have failed to produce a standard authority, or even any decided case, in which Courts have assumed to declare a statute which did not conflict with the constitution, void, because, to the judicial mind, it appeared to be against public policy or private right.

This Court has, therefore, no duties outside of the constitution; and surely none of a legislative character conflicting with the express letter of that instrument. Courts are not to array their own reason against that of the legislature. *Smith's* Comm. 287. We can not declare an act void because it conflicts with our opinion of policy, expediency or justice. This was said by Mr. Justice *Baldwin*, of the Supreme Court of the *United States*, in *Bennett* v. *Bull*, 1 Baldwin 74. So, also, *Calder* v. *Bull*, 3 Dallas R. 386.—1 Kent 408.

If we had the power to look into the reasons and justice of a liquor law, where would the principle end? We might look into the justice of a tax law, or any other enactment; and thus place the representatives of the people at the feet of the judiciary. "History informs us that the arbitrary discretion of a judge is the law of a tyrant, and warns us that it may be so again." 5 Ind. R. 46.

That the people of the *United States* have such entire confidence in their Courts, has often been remarked to our credit by foreign travelers. *De Tocqueville*, c. 6. This sentiment, so generally cherished, imposes upon that department reciprocal obligations. The judiciary can only retain the public confidence by the means which acquired it—the independence of its action and the exalted purity of its motives.

But when the judiciary enters the lists to contest questions of necessity and expediency with the legislature, it sinks in the public estimation into a detested council of revision, such as once held sway in the polity of a sister state. Kent, Lecture 20.—*Ford's* History of Illinois.

The history and legislation of the times, particularly what was the state of the question at the adoption of the constitution, may be of some importance. *Preston* v.

*Browder*, 1 Wheat. R. 115.—*Rhode Island* v. *Massachusetts*, 12 Peters R. 657.

It may be premised, that most of the colonies (*Virginia* as early as *March*, 1660,) enacted laws "to prevent disorders and riots in places where drink was retailed." Since the revolution, it is believed every state in the confederacy has passed laws more or less stringent in relation to the retail of spirituous liquors. At the present moment, the liquor traffic, its evils and remedies, is warmly agitated in many of the states.

The history of the territorial and state legislation of *Indiana* shows that she has invariably held a stern hand over that traffic. Every revision of her statutes, and almost every session of the general assembly, establishes a settled policy in this respect. It would be cumbrous to make quotations and references in point.

It need only be suggested to those familiar with the history of legislation, that she has long ago adopted a qualified prohibitory policy in relation to certain classes of her people. Of this character are the several statutes forbidding any person, under heavy penalties, to sell or give any spirituous liquors to minors, inebriates, or *Indians*. In all these enactments, her right to resort to the policy of qualified prohibition is fully vindicated. These are not all contained in one act—the vagary of a single session. They are numerous, repeated, varied and amended. Such legislation assumes the policy which it implies to be correct and settled.

The pertinence of this part of legislative history, so far as it goes to the question in hand, will be generally conceded.

It is not, perhaps, so generally known, that the principle of prohibition is not a new feature in our liquor laws. It has been repeatedly adopted before, both incidentally and directly.

The prohibitory policy was incidentally or contingently adopted in 1832; though there may have been earlier instances. The proviso to the fifth section of the act of *February*, 1832, puts it in the power of a majority of the

freeholders of each township to defeat an application for license by remonstrance. Acts of 1832, p. 261. Thus were the inalienable rights of the people of the township invaded; the power to buy and sell liquor in every township in the state where a majority remonstrated was taken away. But this Court did not declare the law void.

By an act to license groceries in the counties of *Carroll* and *Cass*, it was left to the voters of the respective townships whether the retail of liquor should be licensed or prohibited. Gen. Laws of 1842, p. 156. The provisions of this act were subsequently extended to *Clark* county, with an amending section. Laws of 1844–5, p. 103. In 1847 this law was made general, with the exception of two counties. Acts of 1847, pp. 46–7. In the following year, that qualified or indirect prohibitory policy was reviewed, and of course approved, by amending the act, giving greater efficiency. Laws of 1848, p. 15. It was again amended in 1849, as to the counties of *Decatur*, *Ripley*, *Jefferson*, *Dearborn*, *Henry*, *Ohio*, *Union*, *Parke*, &c., making it still more stringent. Acts of 1849, p. 83. At the same session, there was a separate act of a similar character for *Wabash* county. *Id.*, p. 84.

The same qualified prohibitory policy, by means of the township vote, was attempted under the new constitution, in the liquor act of 1853. It was declared unconstitutional for other reasons not going to the inhibitory feature. In commenting on that act, the Court say, " Had the people of each township voted 'no license,' there would have been no operative license law in the state for one year from *April*, 1853. And had the people so voted every year for all time to come, no license could ever have issued." *Maize* v. *The State*, 4 Ind. R. 342. The prohibition to retail less than a gallon was complete. During all this period, from 1832 to 1853, there was a standing prohibition and penalty against selling without license. So that the prohibitory policy as to retail was distinctly evolved.

There was a third series of legislative acts, directly adopting the prohibitory principle. Thus, in *January*, 1849, a special act was passed, prohibiting the sale of

any spirituous liquors in *Dalton* township, *Wayne* county,
for any other than scientific or medicinal purposes.  Acts
of 1849, p. 82.  At the same session a similar act was
passed, prohibiting the barter or sale of spirituous liquors
in *Posey* township, *Rush* county, except for medicinal or
mechanical purposes.  *Id.*, 85.  The following year, con-
temporaneously with the convention, an act was passed
for *Plainfield, Hendricks* county, prohibiting the sale of
any intoxicating liquor whatever within two miles of the
post-office, except for medicinal, scientific or sacramental
purposes.  Acts of 1850, p. 123.

Thus was the prohibitory principle adopted partially in
regard to certain classes, as *Indians;* contingently all over
the state by the township vote; and in certain localities
directly.

To these may be added the power conferred by charter
on towns and cities to inhibit or license the sale at their
pleasure; thus clearly assuming that the state had herself
the power which she granted to the municipalities.

Thus has the state, by a series of enactments, at differ-
ent times and in various ways, asserted the principle of
prohibition whenever she deemed it expedient.

During all this period, the action of the several depart-
ments of the government was concurrent and harmonious.
The Courts expounded and indorsed these prohibitory
laws; the executive officers enforced them.   *The State* v.
*Stucky,* 2 Blackf. 289.— *The State* v. *Jackson,* 4 *id.* 49.—
*The State* v. *Watson,* 5 *id.* 155.— *The State* v. *Graeter,*
6 *id.* 105.— *The State* v. *Freeman, id.* 248.— *The State* v.
*Shearer,* 8 *id.* 262.— *Blodget* v. *The State,* 3 Ind. R. 403.—
*The State* v. *Clark, id.* 451.— *Farrell* v. *The State, id.* 573.

Such was the state of the question when the conven-
tion which framed the present constitution assembled.

There was a proposition presented to that body, to the
effect that the state should divest herself of all complicity
with the traffic in liquor as a source of revenue.  That
was the whole extent of the proposition, and it was voted
down.   What was the effect of that vote?   To leave the
question where it found it.   And perhaps it was thus dis-

posed of, like many other propositions, because deemed to be more properly legislative than institutional.

While the convention was engaged in limiting such local legislation as these liquor acts were, they can not be supposed to have overlooked the prohibitory principle. Had that feature been obnoxious, it would have been modified. But while checking these local laws, they silently acquiesced in their principles. This is a weighty consideration as part of the history of the period. In accordance with the doctrine of this Court in 5 Blackf. 384, we can not doubt but that the convention intended to leave the liquor traffic—the prohibitory principle included—precisely where it found it, in the discretion of the legislature.

So that the state of the question when the present constitution was adopted, favors the prohibition.

Some confusion has arisen from a play on the words "regulate" and "prohibit." It is conceded that the legislature has the power to regulate. And why? The unregulated traffic is found to be pregnant with social evils, injurious to the health and morals of the community. In brief, it is notoriously inconsistent with that "peace, safety and well-being" of the body politic, which the constitution was ordained to promote.

Hence the right of the legislature to interfere in any manner. Upon any other hypothesis, the attempt to regulate would be as much a piece of legislative despotism as the attempt to prohibit. Even prohibition itself is but one kind of regulation. The regulation, whether mild or extreme, partial or entire, is the same in principle. The difference is not in the *kind* of interference, but in the *degree*. The act which prohibits the sale of intoxicating liquor by a less quantity than a quart, a gallon, or twenty gallons at a time, is courteously called a *regulating* law. But it is too plain for argument, that such a law is inconsistent with that despotic right of property which is claimed to be secured by the constitution. Is it the right of the citizen to buy and sell and enjoy property as he pleases? If so, a gallon law is an invasion of that right.

Nov. Term,
1855.

BEEBE
v.
THE STATE.

So is every act limiting the quantity. No matter at what point you fix the limit, at two or ten gallons, or by what name you call it, regulation or prohibition, they are all in principle the same. Below the fixed point, they are all in their nature prohibitory.

So long as those who advocate the liquor traffic deny the right of the legislature to interfere in any degree, they are consistent. On abstract principles, that species of property is as sacred as any other. The owners of liquor list it for taxation, and pay taxes upon it like other property. The reciprocal duty of government is to protect. Upon what principles are liquor dealers to be called upon to procure a license at extravagant rates, and file a bond, &c., to entitle them to vend and deal in liquors? And why, even after that, should they be restrained as to quantity, time and place? Abstractly, free traffic in liquor is as much a right of private property as free traffic in flour, or corn, or merchandise. In the abstract, any duty, or tax, or burden imposed upon it, is utterly indefensible. *Orr* v. *Baker*, 4 Ind. R. 86. But if it is admitted that, to conserve " the peace, safety and well-being" of society, the traffic may be regulated and restrained in any degree, the whole point of controversy is conceded. After that concession, it will require a very nice and discriminating casuist to show that, to conserve the public "peace, safety and well-being," the legislature may not, if need be, prohibit the traffic altogether.

In the abstract, all government is tyranny—all political discretion despotism—all interference to regulate the enjoyment of private property an invasion of right. Take a single example. Two men sit down to play cards for money. The room, the cards, the money, are all their own private property. By what right does the legislature call this amusement by the rough name of "gambling," and punish it accordingly? The only possible reason is, that this species of amusement is found to be prejudicial to the public morals.

A law to prohibit the sale of bread, would stand abstractly on the same principle as a law to prohibit the sale

of liquor.  Wherein do they differ?  In the consequences of their use.  The glutton is himself the chief sufferer. The tendency of the inebriate is, to disturb the peace and violate the decencies of society.  In the end, the public purse is taxed either to support him as a pauper, or punish him as a felon.

Hence the life of a law is the reason or necessity for its enactment.  While the prohibition of the sale of bread would be legislative despotism, the like prohibition in regard to liquor, *might* be a measure of profound and necessary policy.

For my own part, I could not readily conceive what government was made for, if it had not the power, both to punish crime, and suppress, if it were deemed necessary to the public good, the means, instruments and incentives to crime.  Self-preservation is the first law of governmental as well as individual being.  It is justly said by the Supreme Court of *Illinois*, that a government which did not possess the power to protect itself against such evils as flow from the liquor traffic, would be scarcely worth preserving.  *Jones* v. *The People*, 14 Ill. R. 196.  So *Woodbury*, J., in the liquor cases, 5 Howard 504.  It is said that these doctrines in *Howard* are not applicable.  They were laid down as first principles, involved in the very idea of a sovereign state.  They are applicable to all sovereignties. They were self-evident, independent of these cases, and needed not the authority even of judge *Woodbury's* great name.

Admit that the vendors of liquor do not force men to drink, the legislature may plausibly urge that they provide the means and spread the allurements which lead thousands to ruin, and that therefore they come within the proper province of legislative cognizance.

The great objection urged to every law which has any semblance of a moral or sumptuary character, is this: that if it is an immoral or indecent habit, to which a great majority are addicted, the law will be nugatory.  It can not be enforced.  If it is a habit which only obtains with a minority, public sentiment will ordinarily suppress it

without the aid of legislation. Hence it is urged that the liquor traffic should be left to public opinion to eradicate its evils.

This is an admirable theory. While pursued in this state conjointly with mild legislation, it worked wonders. But it is found that there are persons so lost to all sense of right, and propriety, and self-respect, as to be utterly callous of public opinion. They know no public opinion but that of the circle of vicious indulgence in which they move. Hence the necessity of legislation on that and other evils which, at a superficial glance, would seem to belong more appropriately to the department of private morals. Of this character are many of the sections under the head of misdemeanors in the revised laws. In these and numerous other instances, it is found that actual experience creates exigencies not anticipated by mere legislative speculation.

The policy of severe laws we are not permitted to discuss. That lies between the people and those to whom they have delegated the temporary power of making laws. 4 Ind. R. 264. Whether temperance is not better promoted by the influence of education and morality than by stringent enactments, is a subject worthy of grave consideration. But we may be permitted to remark, that a sudden change of policy, or the adoption of vindictive measures, is ever to be deprecated. "They provoke resistance, when they were designed to enforce obedience." It may be observed generally of all the liquor laws of *Indiana* for the last twenty years, that if they failed to repress the evils of the liquor traffic, it was not the fault of the law. That was sufficiently stringent and vigorous. The fault was in the execution. These milder laws have always been, in particular localities, and more or less everywhere, a dead letter. Statutes can not execute themselves. In proportion to their severity, they shock the moral sense of the people and paralyze the executive arm. When even mild laws are not executed, it is extravagant to hope better things from odious enactments.

It is said that the opinion of this Court should be placed

on such grounds as would withdraw the liquor question from the arena of politics. But this is clearly impossible. It will continue to agitate the public until it is definitely settled at the ballot-box. The opinion of a Court can no more make men think alike on that, or any other subject, than it can make them look alike. It was one of the despotic vagaries of *Henry* the eighth, to have an act of parliament passed to abolish all diversity of opinion. Act of *April,* 1539.

With far more truth has it been said, that our opinion, whatever it might be, should defend itself. Exactly so. That will be its fate. It should be such, as after the excitement of the hour has passed away, and the pressure of the moment has been lifted from us, our own "sober second thought," as well as that of the public, will approve.

It is proper to add, what was announced in the outset, that the details of the law are not before us; and this opinion is not to be regarded as covering the search and seizure clause. It is confined wholly to the question before us—the power of the legislature to restrain the sale and use.

I am, therefore, of opinion, that it was competent for the legislature to restrain the use and sale of intoxicating liquor; but that so much of the act as relates to the manufacture and agency are unconstitutional and void; but I do not put it on the ground assumed by judge *Perkins.*

What the practical effect of this ruling will be, is not for me to say. The intent with which the liquor was sold in each particular case, whether as incident to the right to manufacture or otherwise, will always be a question for the jury. It presents similar difficulties to those in *Brown* v. *The State of Maryland,* 12 Wheat. R. 419. The Courts will have to settle it on analogous principles.

The case for manufacturing should be reversed, and *Beebe* discharged on the merits.

The conviction for selling is right; but the record and return being defective, should for that reason only be reversed.

Gookins, J.—The appellant sued out a writ of *habeas corpus*, upon the allegation of an unlawful imprisonment by the sheriff of *Marion* county, who returned to the writ that the petitioner was imprisoned by virtue of two commitments issued by the mayor of *Indianapolis*, one upon a conviction for manufacturing, and the other on a conviction for selling, intoxicating liquors, in violation of the act of *February* 16, 1855, entitled "an act to prohibit the manufacture and sale of spirituous and intoxicating liquors, except in cases therein named, and to repeal all former acts inconsistent therewith, and for the suppression of intemperance." On this return the petitioner moved to be discharged from custody. The motion was overruled, and the petitioner remanded; from which decision he appeals to this Court.

The ground assumed for the reversal of this judgment is, that the act above mentioned is unconstitutional and void.

The discussion of the case has taken a very wide range, involving an inquiry into all the provisions of the act. It will be necessary, however, in deciding upon the validity of the commitments, to examine only those portions of it to which they relate.

The first position assumed is, that the act in question transcends the power of the legislature. The argument assumes that the constitution is a grant of powers, rather than a limitation; and that the act is not authorized by any power in that instrument expressed or implied; but that it is expressly forbidden. Before pursuing the argument, it will be proper to refer to those portions of the act which are supposed to be liable to these objections.

The first section prohibits the manufacture or sale of any spirituous or intoxicating liquors, except as in the act provided. The exceptions are wine or cider, made from fruit grown in this state by the manufacturer, (which may be sold in quantities not less than three gallons); liquors imported under the laws of the *United States*, while remaining in the original casks or packages; liquors manufactured under authority from the board of commissioners

of the several counties, which can be sold only to agents appointed by the board; and liquors sold by such agents, for medicinal, chemical and mechanical uses only, and pure wine for sacramental use. The manufacture, keeping for sale and selling of burning fluids, perfumery, essences, chemicals, dyes, paints, varnishes, cosmetics, solutions of medicinal drugs, medicinal compounds, and any other article, compounded in part of alcohol, or other spirituous liquors, if not adapted to use as a beverage, are also excepted. All other manufacturing and selling are declared unlawful, for the doing of which certain penalties are affixed; and liquors kept for unlawful sale, accompanied by the actual sale of a portion thereof, and the vessels containing them, are declared nuisances, and liable to be destroyed on being so adjudged in a regular and formal trial, for which the act provides.

It is, perhaps, not very material whether the power of legislation, contained in the constitution, is to be regarded as a grant or as a limitation. The language is so general that it is impossible to view it in any other light than as a mere designation of the department of the government to which the power of legislation is assigned. It is as follows: " The legislative authority of this state shall be vested in the general assembly, which shall consist of a senate and house of representatives." Art. 4, sec. 1. Language could not be more general; and, admitting it to be a grant, it includes all proper subjects of legislation. Other parts of the instrument contain certain restrictions; and there are also a few subjects of legislation specifically mentioned, mostly referring to the state organization. If those specifications are to be regarded in the light of a power of attorney, which, by authorizing certain things to be done, implies a negative of all others, the instrument, as a form of government, would be wholly impracticable; and the great body of our laws must fall for the want of a foundation on which to rest. This Court has held the legislative power of the state to be supreme, except where restrictions are imposed. *Beauchamp* v. *The State*, 6 Blackf. 299.— *Doe* v. *Douglass*, 8 *id.* 10.

An argument to prove that the state is sovereign would ordinarily be regarded as quite superfluous; but when objections so radical are presented, to prove that she is not, a recurrence to the principles on which the claim rests may not be improper. The declaration of independence asserts the then colonies to be free and independent states, with full power to do all acts and things which independent states may of right do. The confederation of *July* 9, 1778, art. 2, declares that each state retains its sovereignty, freedom and independence, and every power, jurisdiction and right not thereby expressly delegated to the *United States* in congress assembled. This provision was embodied substantially in the constitution of the *United States*, as follows: "The powers not delegated to the *United States* by the constitution, nor prohibited to the states, are reserved to the states respectively, or to the people." Amendments, art. 10.

Principles thus clearly announced need no comment. The rights declared have not their origin in the instruments referred to. In the *American* governments, at least, they exist independently of any such declarations. The state is sovereign, with general powers to do all such things as are necessary and proper to secure the common good.

But the act is said to contravene those provisions of the bill of rights, which secure the people in the right of property, and the pursuit of happiness; and this is perhaps the most important inquiry involved in the case. Preliminary to the examination of this objection, a reference to the general scope and object of the statute seems necessary. It has been assumed in argument, that by this act the state has undertaken to engage in trade and manufacture, to create a monopoly in a particular branch of business, and take the profits to herself, which it is said she has no power to do. Without stopping to inquire whether she has or has not this power, if this construction of the act could be maintained, it would be no ground for the reversal of the judgment. The prohibitory part of the act would still be in force, which *Beebe* violated, and that

the state has no power to manufacture and sell, does not give him the right. But this assumption is based upon a misapprehension of the objects of the statute, as declared in the title and shown by its provisions. It proceeds upon the ground that intemperance is an evil which ought to be prevented; that a proper mode of attaining that end will be to prohibit the manufacture and sale of intoxicating liquors, to be used as beverages. It concedes, however, that there are certain uses, for which they are necessary, or at least convenient, mechanical, chemical, medicinal, &c., and it endeavors to supply that necessity or convenience, through certain agents appointed for the purpose, who have no interest in and derive no profit from the business.

We come now to the main inquiry, can commerce in intoxicating beverages be outlawed? And, as necessarily resulting from this inquiry, to what department of the government does it appertain to declare whether they may or may not be?

That drunkenness is an evil, both to the individual and to the state, will probably be admitted. That its legitimate consequences are disease and destruction to the mind and body, will also be granted. That it produces from four-fifths to nine-tenths of all the crime committed, is the united testimony of those judges, prison-keepers, sheriffs, and others engaged in the administration of the criminal law, who have investigated the subject. That taxation to meet the expenses of pauperism and crime, falls upon and is borne by the people, follows as a matter of course. That its tendency is to destroy the peace, safety and well-being of the people, to secure which the first article in the bill of rights declares all free governments are instituted, is too obvious to be denied. That these evils result principally from commerce in the prohibited articles, is alleged.

The legislature have assumed in their enactment that these evils exist. Does it devolve upon this Court to declare that they do not? Suppose we enter upon the inquiry, whether so large a proportion of the pauperism and crime as is alleged does in fact result from drunkenness; or whether so large a proportion of these evils does or does

not result from commerce in liquors, who is to try these
issues? To what department of the government has the
constitution assigned the power of deciding questions like
these? Can it be legally and constitutionally assumed
that this Court knows more of the effects of this com-
merce, whether good or evil, than the legislature? The
answer seems to be inevitable. The first section of the
bill of rights declares, as has been said, that governments
are instituted for the peace, safety and well-being of the
people. To provide for these, no power is given to this
Court; it is given to the legislature. An attempt to exer-
cise such a power by this Court, would be itself unconsti-
tutional, and an infringement of that instrument subver-
sive of constitutional government. The question is not
whether the law is politic or impolitic. It can be retained,
repealed, or amended, as the people, through their repre-
sentatives, shall require. It is simply a question of power,
and one that is vital to the constitutional rights of the
people. And this power is sought to be exercised upon a
mere question of governmental policy. The duty clearly
devolving upon this Court, of comparing a statute with
the constitution, and of declaring it void because of a con-
flict between the two instruments, is itself a delicate one,
which should always be approached with great caution,
and with due respect to the legislature. But we are asked
to go beyond—to overleap our own constitutional barrier,
and invade their province. When we do this, what is the
consequence? There is no common arbiter, because we
are the tribunal of last resort. The ballot-box is power-
less, for that is but traveling in a circle. Even the re-
forming of the constitution can not supply a remedy, for
rights of the nature claimed for these which are said to
be invaded, natural, inherent and inalienable, can not be
relinquished to or taken away by government. Revolu-
tion and anarchy seem to be the legitimate consequences
of an unauthorized assumption of power on the part of
this Court. I can not consent to take that step.

But it is said that the first and eleventh sections of the
bill of rights are infringed. They are as follows:

"SEC. 1. We declare, that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

"SEC. 11. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The record before us presents no question of search or seizure, and no objection is taken to the commitments for matters of form; but it is said that intoxicating liquors are property; and that the manufacture and sale of them can not be prohibited by law; that they can not be commercially outlawed and declared nuisances.

Here again arises the question already considered: who is to judge whether they are or are not, in the manner in which they are generally used in commerce, such property as the constitution protects? It will probably be conceded that some species of property are not thus protected. A nuisance is defined to be "anything that worketh hurt, inconvenience or damage to the public." Disorderly inns, alehouses, gaming-houses, stages for rope-dancers, mismanaged theatres, &c., are nuisances, because their tendency is to encourage idleness, to corrupt the public morals, &c. *The State* v. *Bertheol,* 6 Blackf. 474.—3 Blk. Comm. 215.—5 Bac. Ab. 147.—*The State* v. *Mullikin,* 8 Blackf. 260.—*Bepley* v. *The State,* 4 Ind. R. 264. In the latter case, the evidence tended to prove that *Bepley,* on a single occasion, sold liquor by a less quantity than a gallon, and suffered it to be drank in his house; and it appeared that he had bottles of different kinds of liquor

usual in retail establishments. It was held, that a jury might convict of nuisance on that evidence. The prosecution was based upon the 17th section of the act of 1853, p. 89, which declares all places or houses wherein spirituous liquors shall be sold or bartered without license, in less quantity than one gallon, or suffered or allowed to be drunk in or about such place, to be common and public nuisances. *Stuart*, J., in delivering the opinion of the Court, says the 17th section is not liable to any constitutional objection; that it is competent for the legislature to declare any practice deemed injurious to the public a nuisance, and to punish it accordingly; and that with the policy or expediency of the measure the Courts have nothing to do. Language could not well be more explicit, nor its application to the point now in judgment more direct. It is not a *dictum*, but a decision bearing directly upon the question before us. This view of the subject is fully sustained by a decision of the Supreme Court of *Massachusetts*, in *Fisher* v. *Mc Girr*, reported in the second vol. Am. Law Reg. 460. *Shaw*, C. J., in noticing a similar objection to a similar law, said: " If spirituous liquor is rightfully taken at all, it is on the ground that it is illegally kept; that being so kept, it is noxious to the public, and *de facto* a nuisance; and when it is adjudged forfeited, it is because it is so noxious, and declared to be such by law, the owner's right of property is divested by the judgment, and he can have no claim to compensation." And again, he says: " The theory of this branch of the law [the abatement of nuisances] seems to be this: That the property of which noxious and injurious use is made, shall be seized and confiscated, because, either it is so unlawfully used by the owner, or person having the power of disposal, or by some person with whom he has placed and intrusted it, and who intends to make a noxious and injurious use of it, of which the public have a right to complain, and from which they have a right to be relieved. Therefore, as well to abate the nuisance as to punish the owner, the property may justly be declared forfeited, and

either sold for the public benefit or destroyed, as the circumstances of the case may require, or the wisdom of the legislature may direct."

We have had statutes in this state, before and since its organization, extending as far back at least as 1807, making the traffic in intoxicating liquors, under certain circumstances, unlawful, and declaring places where they were sold nuisances. And we have had numerous enactments absolutely and entirely prohibiting sales to any person in certain districts of the state, sometimes depending on the vote of the people of a township, town, or city, and sometimes without such vote, and this Court has sustained numerous convictions for the violation of such laws. Gambling apparatus, obscene books, &c., are subjects of traffic, as much so as liquors, and yet the manufacture of and commerce in them have been outlawed. R. S. 1843, p. 985, s. 122.—2 R. S. 1852, p. 441, ss. 52, 53. No copyright can exist, consistently with principles of public policy, in any work of a clearly irreligious, immoral, libelous, or obscene description. Story's Eq. Jur., s. 936, *et seq.* It may be stated as a general principle, clearly deduced from an unbroken current of authorities, that property which has become a nuisance is placed beyond the pale of the law's protection; that it may lawfully be destroyed by those who are injured by it. *Wetmore* v. *Tracy*, 14 Wend. 250.— *Gates* v. *Blancoe*, 2 Dana 158.— *Ellis* v. *The State*, 7 Blackf. 534.— *Meeker* v. *Van Rensselaer*, 15 Wend. 397.— *Bemis* v. *Clark*, 11 Pick. 452.— *Baker* v. *Boston*, 12 Pick. 184.— *Crosby* v. *Warren*, 1 Rich. 385.— *The State* v. *Doon*, 1 R. M. Charlt. (Ga.) 1.— *The State of Pennsylvania* v. *The Wheeling Bridge Co.*, 13 Howard R. 518. Probably no case was ever more elaborately argued than the one last quoted. The interests of the two great states of *Pennsylvania* and *Virginia* were involved, as well as property to a very large amount; but these considerations, weighty as they were, were not sufficient to save the immense and costly structure from an order for its demolition, and the Court said that if the structure be declared a nuisance, there is no room for a calculation and comparison between

the injuries and benefits which it produces. This was certainly property.

There are other instances of property being commercially outlawed. The abolition of slavery in the territory northwest of the *Ohio* river, by the ordinance of 1787 and the constitution of 1816, is one. When that ordinance was adopted, slaves were held at *Vincennes* and *Kaskaskia;* and it was held by this Court, in the case of *The State* v. *Lasselle*, 1 Blackf. 60, that there was no doubt of the power of the legislature to enact a statute of emancipation, nor of the binding force and efficacy of the law when enacted. It is said that large sums are invested in distilleries in this state. Large as the amount may be, it is probably small in comparison to the amount that was invested in the slave trade, when it was abolished and declared piracy. The cases of seizure and confiscation of property engaged in smuggling, are too numerous and familiar to require particular reference to them. It has been suggested that the right to hold slaves is not of common law origin, from which it is inferred that they form an exception to other property. There is no difference between a vested right in property by the common law and by statute. One is as sacred as the other.

Now, as the legislature has declared the manufacture of and traffic in intoxicating beverages unlawful, and such as is kept for unlawful sale, and a sale in fact of some portion thereof, a nuisance, the question arises, has this Court the power to declare the enactment invalid? Does this Court judicially know that commerce in intoxicating beverages does not work hurt or damage to the public? that it is not injurious to the public morals or to the public health? and that it does not produce idleness, vagrancy and crime? Nay more, as this Court can not declare an act of the legislature invalid, unless its unconstitutionality is so clear as to admit of no doubt, (*The State* v. *Cooper*, 5 Blackf. 258; *Beauchamp* v. *The State*, 6 *id.* 299,) do we know, so much better than the legislature, that such effects do not flow from such a cause, as that we can declare beyond a doubt that they are wrong in their enactment?

Nothing less than this will authorize us so to declare. Such a conclusion involves an absurdity no less than that this Court knows that to be false which the rest of mankind know to be true.

It has been urged that the act is a sumptuary law; that it interferes with the abstract rights of individuals, in the pursuit of happiness, which is guaranteed by the bill of rights. The object of a sumptuary law is to restrain and limit the expenses of individuals. The act attempts nothing of the kind, nor is there any provision to prevent a person from drinking whatever he can get. It is commerce that is prohibited. The " pursuit of happiness" is a vague and indefinite term, which can have no relation to relative rights or duties. Allowing what is claimed for it, there would be an end of the criminal code. On a motion to quash an indictment for bigamy, for instance, this claim of abstract rights would receive little consideration. It is the common pretence of communists, anti-renters, and other outlaws, that society has invaded their abstract and inalienable rights; but until society is revolutionized and instituted upon a different basis, these claims will be disallowed.

We have prohibited marriages between whites and blacks; 1 R. S. 1852, p. 361, s. 2; and have made such marriages felony; 2 *id.*, p. 422, s. 47. Personally considered, such a marriage would be a mere matter of taste; but the state deems the product of such marriages, and of commerce in liquors, an undesirable class of persons, and will yield to no clamor in favor of unalienable rights which shall override the public good.

Much has been said in argument of a distinction between the prohibition and the regulation of a traffic. The latter, it is admitted, may be done, while power to do the former is denied. The laws of this state have always absolutely prohibited the sale of liquors to minors, drunken persons, *Indians*, &c. R. S. 1843, p. 980, ss. 95, 96.—2 R. S. 1852, p. 435, s. 26. This, it is said, is but a *regulation*, because it prohibits sales to certain persons only, while if sales can be made to no persons, it amounts to a *prohibition*. But

it must be remembered that we are considering the doctrine of unalienable rights, and while this distinction has great respect to the rights of the vender, it pays none at all to those of the buyer. It claims that the vender must, at all events, have the privilege of selling; but that some may be deprived of the privilege of purchasing. As a matter of fact, it can not be denied that the inebriate, incipient or confirmed, needs protection as much as the actually drunken, the minor or the *Indian;* but all such considerations are necessarily disallowed. This same distinction between regulation and prohibition has also been supposed to apply to the quantity sold. Retailing, it is assumed, to the persons mentioned, may be prohibited, while the sale of large quantities can not be. It is difficult to see how the choice of words, between *regulation* and *prohibition,* or the quantity bartered, can have so great an influence upon a man's inalienable rights—rights which he can not relinquish if he would. It is difficult to see how, consistently with these rights, he may be absolutely prevented from buying, under a mere regulation, or how he can have an inalienable right to buy a large, but no right at all to buy a small quantity.

Again, it has been said that the admitted evils flowing from commerce in liquors may be *regulated* by imposing a tax for the license to sell; and that, as the taxing power is unlimited, the tax may be so high as to amount, not in theory but in practice, to a prohibition. Waiving the question whether, in a well-regulated government, crime or its producing cause should be made a subject of revenue, in the form of an indulgence, it is not easy to see upon what principle the abstract and inherent rights of men may be invaded indirectly, when they can not be directly. Government is not mere theory; it is eminently practical, and useful only as it is practical and substantial. To deny men their rights, in plain terms, has, at least, the merit of open straightforwardness. If that can not be done, a false pretence of raising a revenue, is not a means that will sanctify the end.

From this view of the case, it follows, that there is no middle ground on this question of power, and the conclu-

sion is irresistible, that if the right be of the character supposed, any regulation which interdicts the sale to any person, or class of persons, in any quantity, is void as against natural right, and that all our previous legislation, for fifty years, in which this has been done, was void. Our laws heretofore have permitted sales to some persons, and prohibited them to others. The present enactment does the same, and the only difference is that the prohibition is extended beyond the former limits.

But if the power to regulate be admitted, that of prohibition follows. Chancellor *Kent* treats it as a settled question, that the power to regulate commerce contained in the constitution of the *United States*, includes the power to prohibit it altogether. 1 Kent's Comm., 2d Ed., 431. On this principle the embargo laws were sustained.

The law is said to operate unequally upon certain classes of citizens. That is no sufficient argument against the legislative power. Human laws, from their inherent imperfection, would always be invalid, if this were a sufficient reason. This point was discussed with great ability, by president *Jackson*, in the celebrated proclamation of *December* 10, 1832, an argument which drew from judge *Story* the high commendation of declaring it among the ablest commentaries ever offered upon the constitution. 2 Story's Comm. on the Const., s. 1096, *note*.

A position has been assumed in argument, that the 5th section of the act, which provides for the appointment of agents to vend liquors for purposes deemed lawful, conflicts with the 23d section of the bill of rights, which is as follows:

"The general assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

It is more easy to discover what that section does not mean, than to find any practical operation for it as a principle of government. It may be that some unforeseen event may, in process of time, transpire, which shall call the principle announced in that section into exercise, but the section of the act referred to does not seem destined

to perform that office. It was correctly argued by the appellant that the agency here provided for was an office. The relation of the agent to the public is similar to that of inspectors of provisions, measurers of wood, weighers of hay and coal, &c. It is quite evident that all men can not hold these offices or employments, and if they can not, whatever else the 23d section of the bill of rights may mean, it can have no application to the privileges or immunities there mentioned.

Another objection taken to the act is, that it takes away the right of trial by jury. That question does not arise in this record. This is an attack upon the judgment of the mayor collaterally. The question suggested could be raised only in a case in which a jury, when demanded, had been refused. But there is no doubt that, if the statute does take away that right, it is, to that extent, void. There is, however, no Court authorized to take cognizance of any offence arising under the law, that is not provided with a jury; and such being the case, the constitutional right of the accused to be tried by jury necessarily follows. It would require an express provision denying that right to take it away. Nothing of the kind appears in the act; on the contrary, the trial by jury is in express terms recognized in most if not all the cases which can arise under it. There are but few of our acts which provide in express terms for trial by jury. In those which relate to the punishment of crimes and misdemeanors, no mention is made of trial by jury, and if this objection is well taken, there has never been a valid conviction under them. The consequence would be that all judges, and other officers concerned in the administration of justice, in every conviction of and execution for murder, and the enforcing of fines and imprisonments, were trespassers. This will scarcely be insisted upon.

Another objection taken to the act is, that it conflicts with the 19th section of the 4th article of the constitution, which is as follows:

"Every act shall embrace but one subject and matters properly connected therewith; which subject shall be ex-

Nov. Term,
1855.

BEEBE
v.
THE STATE.

pressed in the title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title."

The objections more specifically stated are, that the act embraces more than one subject, and matters properly connected therewith; and that those parts of the act which are upon subjects improperly embodied in it, and not mentioned in the title, are to be rejected.

If this objection prevails, the entire act is nugatory. Nothing is said in the title about penalties, and a law of this kind without a penalty is of no force; none could have been assessed against *Beebe*, and he should have been discharged. Other portions of the act provide for the appointment of agents to manufacture and sell, which do not necessarily require consideration in this case; but the argument has been pressed upon us, and while on the subject, it may be proper to notice them.

The general subject of the act has already been stated to be the suppression of intemperance; the prohibition of the manufacture and sale of liquors, except in certain cases deemed beneficial, being the means proposed for attaining that end. If it had no title, the context would show this to be the subject. The constitution does not require that the "matters properly connected with" the subject shall be mentioned in the title. Partial prohibition being the principal means, that, of course, properly appertained to the subject. Exceptions to the prohibition having been determined upon as a part of the enactment, the means of carrying them into effect were not only proper but indispensable. This includes the appointment of agents, the prescribing of their duties, &c. We have already seen that penalties were necessary to give the act any force. These, then, are all matters properly connected with the subject of the act.

It is said that we have a general law providing for the punishment of misdemeanors, and that the penalties provided for in this act should have been incorporated into that act by way of amendment, and that if placed else-

where they are void.  The fact that the provisions might
have been placed there is no reason why they may not be
incorporated into a different statute, if applicable to its
provisions.  Subjects are almost infinitely divisible, and it
might with equal propriety be insisted that each separate
offence mentioned in the criminal code is a separate sub-
ject, as the subject of murder, of larceny, &c., as that the
punishment of an offence does not appropriately range
under a title whose generic terms, to-wit, the suppression
of intemperance, are sufficiently broad to cover it.

A glance at our legislative history will relieve us of any
difficulty upon this question.  The constitution of 1816
contained no restrictions of this kind.  Under it bills were
sometimes passed containing matters foreign to each other,
by securing a combination of interests, when neither of the
measures could have been adopted upon its own merits.
Such bills were frequently passed without ever being read
in either house except by their titles, which often contained,
besides the general subject, the words "and for other pur-
poses," which were vague enough for any imaginable sub-
ject to be classified under them.  In this way frauds and
impositions were sometimes practised, and there is a
notable case shown by the journals, in which a large
appropriation of money for the construction of a turnpike
was incorporated into a bill for establishing a highway of
no public concern, which was not discovered until the bill
had passed both houses.  To remedy these evils several
provisions were inserted in the constitution of 1851, one of
which, as we have seen, declares that an act shall contain
but one subject and matters properly connected therewith,
but provides that, if a foreign subject be introduced, the
act, as to that only, shall be void; another is, that every
bill shall be read through by sections on its final passage,
and that the yeas and nays shall be entered upon the
journal.

As the act under examination has a general design to
which all its parts have an appropriate relation, it seems
clear that it is not liable to this objection.  This view is
sustained by the uniform action of the legislature, since

the adoption of the constitution, as will abundantly appear by reference to the various enactments of the present code, a few of which may be noticed.

In the title of the act organizing this Court, nothing is said about the time its terms shall be held, the occupancy of rooms assigned to the judges, the appointment of a chief justice, or the power of the judges to hold Circuit Courts, all of which are contained in the act, and each of which might be regarded either as an independent subject, or as appertaining to some other. The act for the appointment of the sheriff of this Court provides for his fees and compensation, although there is a general law on the subject of fees and salaries. The act organizing Circuit Courts contains subjects quite as incongruous as any in this, among which are the appointment and compensation of judges *pro tem.*, the appointment of elizors, their oath and bond, although we have a general law on the subject of official bonds. The following is the title of a very important act, to-wit: "An act to establish Courts of Common Pleas, and defining the jurisdiction and duties of, and providing compensation for the judges thereof." Why was not the provision for compensation placed in the act in relation to fees and salaries, if this be a valid objection? The bill which became that act was reported to the house of representatives by the chairman of the committee on the organization of Courts, who was also a member of the judiciary committee, and it was passed with great deliberation. This objection, if valid, applies to the act for selecting jurors and providing for their compensation, to numerous provisions of the practice act, to the common school law, to the justice's act, which, besides prescribing their duties generally, provides for their election, duties of the board of election, the filling of vacancies, the giving of bond, jurisdiction and practice, on most or all of which subjects there are other general statutes; and there are various other instances in which jurisdiction is given to them, such as, of tenants holding over, bastardy, &c. The act in relation to marriages (1 R. S. 362, ss. 9, 10, 11 and 12,) contains the definition of and penalties for three dis-

tinct misdemeanors, besides providing an action in favor of the state to recover another penalty, and compensation for the attorney who prosecutes the suit. In short, it is difficult to say what of the entire revision would be left, if this objection prevails. The provision of the constitution referred to was never designed to have any such effect. Its object has been stated. To give it the effect claimed for it, would make the instrument wholly impracticable, and the laws passed under it a tissue of absurdities.

But one other objection taken to the act will be noticed. It is said to conflict with the 23d section of the 4th article of the constitution, which declares that laws shall be of uniform operation throughout the state. This conflict is supposed to be found in the 4th, 5th, 6th, 7th and 8th sections of the act, which authorize the appointment of agents to manufacture and vend liquors for purposes declared lawful, specify their qualifications, and prescribe their duties. This part of the act, it is insisted, is invalid, because it gives a discretionary power to the board of commissioners to appoint agents, or not, as they may choose; and as some may and others may not exercise the power, the operation of the law, it is said, will not be uniform. This assumption not only requires uniformity in the operation of the law, but also uniformity in subjects upon which it operates. By the same rule the criminal code will operate unequally, if no crimes shall be committed in some part of the state.

There is another answer to the objection. The power of appointing agents is not discretionary, but the commissioners are bound to exercise it. The 5th section provides that the county commissioners, at any meeting of their board, *may* appoint, &c. The rule which governs the case is correctly stated in *Smith's* Commentaries on Statutes, &c., sec. 599, as follows: "The words 'shall' or 'may' are to be construed as imperative in all cases where a public body or officers have been clothed by statute with power to do an act which concerns the public interest, or rights of third persons; and, in such cases, the execution of the power, or the doing of the thing required, may be insisted on as a duty, though the phraseology of the statute

be permissive merely, and not peremptory." The language quoted by the commentator is that of *Nelson*, C. J., in 3 Hill 612, and the other authorities referred to fully sustain the position.

The suggestion that no person may be found willing to accept these appointments, would apply with equal force to executors, administrators, and every other public office and employment in the state.

Those which have been noticed, are the principal objections taken to the law. There are various other provisions found in the details of the act of which the appellant complains, but they do not arise in this record. Whenever they are properly presented, they will doubtless receive due consideration.

I am of the opinion that the judgment of the Court of Common Pleas ought to be affirmed.

*Per Curiam.*—The judgment is reversed, and the prisoner discharged.

*J. Morrison, W. T. Otto, J. W. Chapman, D. Wallace, E. Coburn* and *J. S. Hester*, for the appellant.

*D. McDonald, L. Barbour, A. G. Porter, H. C. Newcomb, J. Coburn* and *N. B. Taylor*, for the state.